UNION TRUST CO. *v.* DETROIT & RIVER ST. CLAIR RAILWAY.

MORTGAGE BONDS—BONA FIDE PURCHASER—RAILROADS—LIEN OF LABORERS.

*1. Under the facts stated in the opinion, the purchase of mortgage bonds is held not to be *bona fide,* and the purchaser is entitled to recover only what he has actually paid therefor.

2. Where such purchaser gave a note to his vendor for the

---

* Head-notes by GRANT, J.

purchase price of the bonds, *held* that such note cannot be impounded to pay the debts of the vendor, though due to laborers for the construction of the roadbed.

Cross-appeals from St. Clair; Vance, J.   Submitted January 29, 1901.   Decided July 2, 1901.

Bill by the Union Trust Company against the Detroit & River St. Clair Railway, impleaded with Henry J. Robeson, to foreclose a trust mortgage.   From the decree rendered, both parties appeal.   Modified.

The bill in this case was filed to foreclose a trust mortgage, of which the complainant was trustee.   The mortgage was executed by the Detroit & River St. Clair Railway.   The bonds mentioned in the mortgage amounted to $350,000, of which only 130 were in fact issued, amounting to $65,000.   All but $26,000 of that issue had been taken up before this case was heard in the court below. Those were issued to one John A. Smith, who took a contract to construct the roadbed and lay the rails; and were transferred by Mr. Smith to Merrill B. Mills, who claims to be a *bona fide* purchaser, and entitled to receive the face value of the bonds, and interest thereon.   Defendant denies that Mills was a *bona fide* purchaser, and contends that he is entitled to receive only $12,770.   The proofs were taken in open court, before the late Judge Vance, who filed a written opinion.   In that opinion he gave a connected history of the transactions from the organization of the defendant company to the time of the rendition of the decree, and made a full statement of the facts.   That statement is as follows:

" The Detroit & River St. Clair ˙ Railway Company was incorporated under the street-railway law ( Act No. 35, Laws 1867, as amended ), and had for its object the building and operating of an electric railway from Mt. Clemens, in Macomb county, to Marine City, in St. Clair county.   Its capital stock was $350,000, and to construct and equip the road it issued $350,000 first mortgage, ten year, six per cent. gold bonds, and secured them by a

mortgage on all its property and assets, present or prospective, to the Union Trust Company, as trustee. The River St. Clair Construction Company, Limited, was a copartnership, limited, organized for the purpose of constructing the Detroit & River St. Clair Railway.' Its stockholders and officers were for the most part the same as those in the Detroit & River St. Clair Railway. Lester B. French was the promoter of this road, was the general manager of the railroad company, a stockholder, director, and president. He was the general manager of the construction company, and a director of that company, also.

"In the fall of 1895 the Detroit & River St. Clair Railway Company entered into a contract with the construction company to build the road and equip it for $325,-000 of the stock and all the bonds of the railway company. The stock and bonds were to be delivered to the construction company as the work progressed, on the estimates of the engineer employed on the work. Estimates were to be made as often as either party required, and payments were to be a *pro rata* of the stock and bonds for a *pro rata* of the work actually accomplished, labor performed, and material actually supplied. The construction company was to get the balance of the right of way, furnish all material, and complete and equip the road with electricity within two years.

"The railway company, on September 27, 1895, after having issued its bonds and stock, and placed them in the hands of the trustee, wrote the Union Trust Company, as such trustee, as follows:

"'The 700 bonds of the Detroit & River St. Clair Railway Company, amounting to $350,000, now in your hands, belong to the River St. Clair Construction Company, Limited. You will therefore please hold said bonds as agent for, and deliver them only upon the order of, said River St. Clair Construction Company, Limited.'

"About the same time, the construction company sublet a portion of the work to John A. Smith. Mr. Smith was to grade, bridge, trestle, tie, iron, and ballast the road from Chesterfield to Marine City,— the construction company to furnish the ties and iron,—and have it completed on or before December 14, 1895. For this work Mr. Smith was to have $50,000, made up of cash $2,500, and bonds of the railway company, issued as aforesaid, $47,500. He was to have $1,000 in bonds for each mile

when ready for ties and iron, and $800 more for each mile when tied, ironed, and ballasted, and the balance when the road was completed. It was further provided that, when the road was completed from Chesterfield to New Baltimore, the $2,500 in cash should be paid, and stand in lieu of bonds, as before stated.

"Mr. Smith commenced the work, and proceeded with its construction until December 7, 1895, when all work stopped. At this time Mr. Smith had graded the roadbed from Chesterfield to within about two miles of Marine City, excepting some portions which had been left for the time being. Only two bridges were completed, some others were started, and there were some on which nothing had been done. The roadbed was tied and rails laid from Chesterfield about five miles easterly, to within a short distance of New Baltimore. The grading was not, in fact, in accordance with the contract, as appears from the evidence; the spiking was by no means complete; and the ballasting was not done at all on that portion of the road that was ironed. Up to this time Mr. Smith had received on the contract about $6,000 in bonds and $2,500 in cash. He was unable to negotiate these bonds, or raise money on them, and, being without means otherwise, could not pay his men, and for that reason, on December 7, 1895, the men refused to longer work. He had doubtless been delayed somewhat by the failure of the construction company to furnish iron and ties, but I am satisfied the work would have continued for some time longer but for Smith's inability to pay his men.

"Negotiations then commenced between Smith and the construction company for an adjustment under the contract between them, and, this failing, Smith demanded, in writing, $20,000 in bonds, claiming that amount was due him under his contract. The officers of the construction company, after consulting with their attorney and the engineer in charge, directed the Union Trust Company, on December 10, 1895, to give Smith $20,000 in bonds, and they were delivered to him. The delivery of these bonds was not pursuant to a settlement, nor was it so understood by either party. Mr. Smith was threatening legal proceedings unless these bonds were delivered, and the construction company delivered them under the advice of their counsel that it was better to deliver the bonds than to have any controversy at that time. The delivery of these bonds to Smith was as a payment on the contract. Mr. Smith at this time had abandoned his

contract with the construction company, and was then aware that the construction company were unable to complete their contract with the railway company. Nothing further was ever done either by Smith or the construction company towards constructing the road. At this time these bonds had no actual market value. They were practically valueless unless the road was completed.

"The construction company was unable to realize on the bonds they held under their contract with the railway company, and, while efforts were made from time to time to induce parties with means to raise money on these bonds to complete the road, they were not successful. Up to this time but $65,000 in bonds had been actually delivered to the construction company, or to any one else on its order. Of this amount $29,000 was held by the Grand Trunk Railway Company as collateral for iron furnished the construction company, amounting to $14,000; $5,500 was held by Culligan & Doyle as collateral for ties furnished the construction company, amounting to $4,500; $4,000 was held by John Chester as collateral for a loan of $2,000 to the construction company; $500 was held by John Donahue, delivered to him by the construction company in payment for ties; and $26,000 was held by Mr. Smith under the circumstances aforesaid.

"The work done and materials furnished by the construction company and Mr. Smith up to the time work stopped amounted to the total of the following items:

| | | |
|---|---:|---:|
| Construction company, to the Grand Trunk, for iron | $14,000 | 00 |
| Construction company, to Culligan & Doyle, for ties | 4,500 | 00 |
| Construction company, to John Chester, for a loan | 2,000 | 00 |
| Construction company, to John Donahue, for ties | 500 | 00 |
| Total | $21,000 | 00 |

| | | |
|---|---:|---:|
| John A. Smith, cash disbursed, as shown by his books | $2,872 | 38 |
| John A. Smith, labor claims unpaid, as shown by his books | 4,936 | 06 |
| John A. Smith, debt to Wing & Co. on account | 500 | 00 |
| John A. Smith, outlay for timber for bridges (about) | 500 | 00 |
| Total | $8,808 | 44 |

| | |
|---|---|
| Less cash received by Smith from the construction company under his contract | $2,500 00 |
| Actual cost | $6,308 44 |

"I am of the opinion that some of the items of expense which Smith incurred did not appear upon the books.

"October 15, 1896, the Union Trust Company, at the request of John A. Smith, filed its bill, as trustee, to foreclose the mortgage given to it by the Detroit & River St. Clair Railway Company to secure the issue of $350,000 in bonds, asking for a receiver; and on October 31, 1896, filed its petition asking for the appointment of a receiver, supported by affidavits. Counter affidavits were filed, and the matter was adjourned from time to time until January 9, 1897, when, by consent of the parties in interest, James G. Tucker was appointed receiver, qualified, and took charge of the road and all the property covered by the mortgage, which was all the property the Detroit & River St. Clair Railway Company owned.

"On February 7, 1897, the receiver petitioned the court for authority to obtain renewals of the franchises from the cities, villages, and townships through which the road passed, for the reason that all had lapsed excepting in the township of Ira, St. Clair county, and asking authority to enter into a contract with the United States Equipment & Construction Company to complete the road from Mt. Clemens to Marine City in first-class manner for $500,000, to be paid in receiver's certificates issued under the order of the court, the equipment and construction company to pay the amount of the investment of the holders of the bonds out of the proceeds of said certificates. On the same day a stipulation was signed by the solicitors for the Union Trust Company, Detroit & River St. Clair Railway Company, the Grand Trunk Railway Company, the Delta Lumber Company, for John A. Smith and for Henry J. Robeson, who claimed to represent the outstanding labor claims, being all the parties in interest. This stipulation was filed, requesting the court to make an order, a copy of which was attached. This order was signed the same day, and granted the prayer of the petition; the contract, however, to be subject to the approval of the court. The contract, by the terms of the order, required the equipment and construction company to pay the bondholders the amount invested in the construction, or material used or furnished for use, and all labor performed, in the con-

struction of the road, and required the equipment and construction company to give a $25,000 bond by way of security for the performance of the work.

"Preparatory to entering into this contract, the equipment and construction company, represented in fact by C. H. Lawrence, entered into a contract with John A. Smith, about April 14, 1897, by which Lawrence was to pay Smith $12,770 for the bonds held by him, and all his interest in or claims against the road. This contract was drawn by Elliott G. Stevenson, the attorney for the receiver, and the facts cited therein were furnished to him by John A. Smith and his attorney, Frank E. Robson. In this contract it is stated that the above amount represents the unpaid balance of the value of the work done and materials furnished by Smith in the construction of the road, and also that the bonds held by him were to secure such indebtedness. Out of the $12,770 Smith was to pay a note of his, held by the Union Trust Company, of $2,000; pay all outstanding labor claims contracted by himself and unpaid, estimated at $5,000; receive $2,000 in cash, and take $3,770 in receiver's certificates. The terms of this contract were known to the receiver. For some reason Mr. Lawrence failed to go on with this contract, and nothing was afterwards done under it.

"It was generally understood by all the parties in interest that the outstanding labor claims, estimated at $5,000, and the interest on those old bonds, could not be paid unless the road was completed, so as to make it salable, and thus preserve the interests of the different parties. To this end various plans were suggested during the summer of 1897, but none took tangible form until November 17, 1897, when the receiver presented his petition to the court, stating, among other things, his inability to dispose of the road for enough to pay the indebtedness of the company, or in fact pay anything but a trifling sum, and asking authority to complete the road from Chesterfield to Algonac, and for the authority to issue $60,000 in receiver's certificates, to be sold at not less than 90 cents on the dollar, to defray the expense. At the same time a stipulation was filed, signed by the Union Trust Company, the Detroit & River St. Clair Railway Company, the Grand Trunk Railway, the Delta Lumber Company, Lester B. French, and John A. Smith, consenting that the prayer of the petition be granted. A hearing was had on this petition, and it was made to appear by testimony that the road, when constructed, would, in all probability,

take care of the receiver's certificates, and eventually pay off the other indebtedness of the road.   Before the signing of the petition last referred to, the plan of constructing the road by the receiver was fully discussed between the receiver, Mr. Stevenson, his attorney, John A. Smith, and Mr. Robson, his attorney; and in this discussion Mr. Stevenson agreed to find a market for the receiver's certificates.   At this time Mr. Stevenson had no interest in the road, and he and the receiver then understood that Mr. Smith's claim amounted to not to exceed $12,770, and that out of that the labor claims, estimated at $5,000, were to be paid, and on payment of that amount the $26,000 in bonds would be canceled; and Smith was aware of this understanding.   On November 20, 1897, an order was entered granting the prayer of the petition.

"In order to protect himself against the liability he would incur in finding a market for the receiver's certificates, Mr. Stevenson, about December, 1897, took an option on the stock of the Detroit & River St. Clair Railway Company, and advanced $1,000 on it.   By this option he was to have the entire stock of the road on paying $14,000 for it within one year.   Subsequently, on April 23, 1898, on the application of the receiver, and a full hearing had thereon, the receiver was authorized to issue $15,000 in receiver's certificates, in addition to those already issued, to complete the road from Algonac to Marine City, and to aid in the equipment.   On December 3, 1898, the receiver was authorized, after a full hearing, to issue $35,000 in receiver's certificates, in addition to those already issued, the greater portion of which was for money advanced to the receiver by E. G. Stevenson, and other balances for expenses incurred.   Of the $110,000 in receiver's certificates authorized, only $102,114.80 was actually issued and used.   Of this amount in certificates issued Mr. Stevenson purchased for cash upwards of $31,500, the Michigan Construction Company — which was, in effect, Mr. Stevenson — $25,000, and he guaranteed about $———, in order to make the certificates marketable.   The road was completed from Chesterfield to Marine City in July, 1898, so that cars ran over it, but the equipment was insufficient for good service.   In lieu of building the road from Chesterfield to Mt. Clemens, a lease was taken from the Grand Trunk Railway Company to run over its track between these two points.   Owing to the incomplete condition of the road and its equipment, which cost much more than anticipated, and the fact that

it was equipped with steam, and not electricity, its earnings did not furnish enough to pay operating expenses and the indebtedness incurred by the receiver.

"In the meantime the Detroit, Lake Shore & Mt. Clemens Railway Company had completed and equipped its road from Detroit to Mt. Clemens by way of the lake shore and McSweeney's Club House. The Rapid Railway had been in operation from Mt. Clemens to Detroit for some years. Each of these competing lines was anxious to control the Detroit & River St. Clair Railway Company. In the meantime Mr. Stevenson and others interested with him nominally, in order to protect himself, obtained control of the Mt. Clemens & Lakeside Traction Company, which company controlled the street-car system in the city of Mt. Clemens. About October 15, 1898, he negotiated with Merrill B. Mills, of Detroit, who practically owned all of the stock and bonds of the Detroit, Lake Shore & Mt. Clemens Railway Company, was a director and one of the principal officers of that company, for a sale to Mr. Mills of the traction company's property in Mt. Clemens, and as a part of the sale Mills was to assume and pay all the debts of the receiver, including certificates issued, and relieve Mr. Stevenson from any obligation thereon, and he was to have what right Mr. Stevenson had in or to the stock of that company, including the option aforesaid. In these negotiations with Mr. Mills, the indebtedness of the receiver and the old debts of the Detroit & River St. Clair Railway Company, including the bonds issued, and the amounts due thereon, and outstanding labor claims, were fully discussed, and he was then advised that John A. Smith held $26,000 in bonds; that there was due Smith on these bonds $12,500 or $12,770; and that out of this amount the so-called 'labor claims,' amounting to about $5,000, were to be paid; and that Mr. Stevenson so understood it. At this time Messrs. Ranney and Fordyce, who were directors and officers in the shore road, held an option on Smith's bonds, which was in fact in the interest of the shore road, for $13,000, dated August 2, 1898, by which payment was to be made in 30 days, but with a proviso for a 30-day renewal. Mr. Mills knew of this fact at least as early as October 15th. On this option Ranney and Fordyce had paid Smith from the funds of the railway company $900.

"On February 7, 1899, E. G. Stevenson entered into a contract with Cornelius J. Reilly and Charles M. Swift, principal owners of the Rapid Railway Company, by

which he sold them the Mt. Clemens & Lakeside Traction
Company's property in Mt. Clemens, and all the stock of
the Detroit & River St. Clair Railway Company, agree-
ing to pay all outstanding certificates and indebtedness of
the receiver, the bonds and other debts of the Detroit &
River St. Clair Railway Company, including the labor
claims and other debts that had become a lien on the road,
or for which it was liable.   Merrill B. Mills learned of
this contract shortly after its execution, and that Steven-
son had, by its terms, obligated himself to pay all the
debts of the road.   Subsequently, and about March 16,
1899, Mr. Mills purchased from Mr. Smith his $26,000 in
bonds for $12,500, and took a bill of sale therefor, in
which Smith agreed to pay all labor claims that were a
lien upon the road.   Mr. Mills was to pay for these bonds
as follows:   A note for $7,000, cash $4,600, and have
credit for the $900 paid by Ranney and Fordyce from the
railroad company's funds to Smith under his option of
August 2d.   The note of $7,000 was executed by Mr.
Mills, and delivered to Frank E. Robson, the attorney
for Mr. Smith, and is still held by Robson, who is still
Smith's attorney.   This note in fact belongs to Smith.   It
is subject, however, to $1,200 borrowed by Robson, and
for which this note is given as collateral security.   During
all this time Mr. Tucker, the receiver, and Mr. Stevenson,
who was counsel for the receiver, understood and believed
that Mr. Smith's claim did not exceed $12,770, and that
the bonds were held by him as security; and Smith him-
self furnished this information, and knew that they so
understood it.   Neither of them knew that Mr. Smith
claimed these bonds were delivered in payment until after
Mr. Stevenson had sold to Reilly and Swift, on February
7th.

"Owing to the fact that the road was equipped with
steam, instead of electricity, the terms of the franchises
through the different townships, cities, and villages were
not complied with within the time therein limited.   The
outstanding claims — and especially the labor claims —
contracted by Smith, and remaining unpaid, were owned
largely in the locality through which this road was to run,
and the holders of such claims were complaining bitterly.
The officers of the municipalities from which a renewal of
the franchises was sought, being aware of these facts,
insisted that the renewal of the franchises be only upon
condition that these outstanding labor claims should be
paid.   The receiver, in order to procure a renewal of the

franchises and preserve the property, was compelled to accept this condition, and did so with the knowledge, consent, and acquiescence of John A. Smith; and Mr. Smith himself assisted in procuring some of them, and knew that the receiver was accepting them on the understanding above stated.

"While the men were working for Smith under his contract in the fall of 1895, it was the custom to issue to the men time checks when he was unable to pay them. The checks were exchanged by the men for goods and other things, with Smith's knowledge and consent, and with the understanding with Smith that the holders of these checks, on reporting to him, would be entitled to credit therefor; and, as fast as they were reported to him, the men to whom they were given were charged with the amount, and the holder credited, on Smith's books. In other instances the men ran bills at stores and for board, and, by an understanding with Mr. Smith, the boarding-house or store keeper would report the names of the men, or their number, and the amount of his bill, to Mr. Smith, and the men were charged on Smith's books with the amount, and the boarding-house or store keeper, as the case might be, was given credit. All these matters, whether represented by time checks, store accounts, or boarding-house accounts, were in fact labor claims, and ought to be so considered in construing the provisions of the different franchises."

From the above statement of facts the learned circuit judge reached the following conclusions, which he put in writing and filed:

"The foregoing sufficiently states the facts shown by the testimony for the purpose of disposing of the matters involved. By an understanding in open court, Mr. Stevenson, under his contract with Swift and Reilly, is to take care of the outstanding receiver's certificates, and all the bonds and other debts that have become a lien on the road, excepting the so-called 'labor claims' and the Smith bonds, and as to these matters a determination is asked for.

"As to the Smith bonds, so called, now claimed by Mr. Mills, I am of the opinion that, under the facts and circumstances of this case, Mr. Mills is estopped from claiming, as against the railroad company, the full face value of those bonds, and that he is entitled only to the amount of $12,770, with interest at the rate and payable in the manner specified in the coupons attached to said bonds.

"As to the so-called 'labor claims,' I am of the opinion that the 'boarding-house claims' and the 'storekeepers' claims,' so called, were intended to be included and considered as labor claims in the preparation and adoption of the franchises in the different municipalities through which the road passed, and that they must now be considered as labor claims in the construction of said franchises. Inasmuch as the provisions of these franchises were demanded by the municipalities granting them, and consented to by the receiver in receiving them, and inasmuch as it is just and equitable that these claims should be paid, I am inclined to hold that the municipalities may forfeit the franchises unless these provisions are complied with. They had a right to refuse the franchise in the first instance, or to refuse a renewal; but, having granted them upon conditions which were accepted by the receiver, I am of the opinion that they are valid, and should be enforced according to their tenor and meaning. I am also of the opinion that the provisions in some of the franchises with reference to the filing of claims with the receiver or placing them in judgment, etc., are directory only, and that all these labor claims are covered by one or other of these franchises. Inasmuch as these debts were contracted by Mr. Smith, and ought of right to be paid by him, and inasmuch as the note of $7,000 in the hands of Frank E. Robson is still the property of Mr. Smith, at least to the amount of $5,500, with accrued interest, I am of the opinion that the proceeds of this note should be applied to the payment of these so-called 'labor claims.' If it is insufficient to pay the whole, then it should be applied *pro rata* on them. If it is more than enough to pay them, the surplus should be turned over to Mr. Smith.

"Evidence was presented of other claims, but I am of the opinion that the testimony in this case does not show that they were in any way a lien upon the railroad, its property or franchise, or were debts owing by the railroad, and for that reason provision for their payment cannot be made in this decree; but the proceedings herein should be without prejudice to the enforcement of such claims in such other manner or by such other process as the holders thereof may see fit to adopt.

"Inasmuch as the two questions above referred to were not of general interest to all the bondholders, the so-called 'labor claims' being matters in which Mr. Smith was particularly interested, and the Mills bonds being a matter

in which Mr. Mills was particularly interested, and inasmuch as Mills and Smith were both represented by counsel, I am of the opinion that the claim for solicitors' fees is in excess of what would be just and right in the premises. A solicitor's fee should be allowed at $1,500; and, the complainant's solicitors having agreed among themselves as to the division, the amount will be allowed in gross.

"It was stated in open court that the compensation for the services of the trustee had been agreed upon, and therefore no determination in that matter is necessary."

A decree was entered in accordance with the above opinion, with costs to complainant. Complainant has appealed from that portion of the decree which limits the recovery upon the bonds owned by Mr. Mills to an amount less than their face value and interest; and also from that portion of the decree which impounds a part of the $7,000 note, in the hands of Mr. Robson, to pay the labor claims contracted by Mr. Smith. The defendant railway company has appealed from that part of the decree allowing to complainant $1,500 for compensation to its solicitors, and also from that part allowing interest on the $12,770.

*Frank E. Robson* and *Russel & Campbell*, for complainant.

*Gray & Gray*, for defendant railway company.

*Alfred Lucking*, for Merrill B. Mills, bondholder.

GRANT, J. (*after stating the facts*). 1. We think the facts found by the learned circuit judge are fully sustained by the evidence. It is apparent that the decree is eminently just and equitable in so protecting the rights of all parties that each loses nothing, and obtains full compensation for all labor performed, materials furnished, and moneys invested in the construction of this road. Manifestly, such a decree ought to be sustained, unless it is in conflict with inflexible rules which control courts of equity as well as of law.

The entire trouble has arisen from the fact that the promoters, the original stockholders, of this railway com-

pany, attempted its construction upon nothing more substantial than wind. They paid nothing upon their stock, and did not intend to. Some of the promoters and stockholders formed the construction company, — a company with limited liabilities. What those liabilities were does not appear. It was understood, both by the stockholders of the railway company and by the construction company, that those who should construct and equip the railway should be paid in nothing but stock and bonds. Smith, a man financially irresponsible, was awarded a contract to construct the roadbed, lay the iron, tie and ballast the road. All this was to be done within less than three months. The work was in reality worth about half of the face value of the bonds. Smith expended and incurred liabilities amounting to about $12,770. The bonds he had received were worth nothing. They had no market value. No one would buy them, or loan money upon them. The construction company failed to pay. The railway company had agreed to pay nothing but its certificates of stock and bonds. In a sentence, the whole enterprise collapsed, with no assets but a right of way over part of the line, and a roadbed which was being washed away by the rains. Affairs continued in this shape for about two years. Meanwhile Smith, in writing, represented the amount he had invested at $12,770. The receiver found no tangible assets; and, unless some way could be devised to provide for the construction of the road, the bonds which had been issued, including those of Smith, were without value. Under the direction and authority of the court, Mr. Stevenson, attorney for the receiver, was allowed to proceed to construct the road by the use of receiver's certificates. This action alone has made the Smith bonds of any value whatever. That he represented his interest to be $12,770, and that he permitted Mr. Stevenson and the receiver to proceed with that understanding, is established beyond controversy. I think it equally well established that Mr. Mills, when he purchased these bonds, was fully cognizant of the situation, and of

Mr. Smith's claims and representations. This being so, both are estopped to claim the face value of the bonds.

It is, however, urged that the estoppel is not pleaded in the answer, and therefore cannot now be made available as a defense. All the other bonds which were issued were collateral for loans to, and material furnished for, the construction company. There is testimony from which it might be properly inferred that Mr. Stevenson understood that Smith held these bonds as collateral to his claim. However that may be, we think the amended answer sufficiently sets forth the claim of the defendant to admit this defense. While it does not aver in words that Smith and Mills are estopped, it does set forth the facts upon which the defense is based. If, however, it were necessary, under the circumstances of this case, to amend the answer in order to make this defense available, we should not hesitate to allow it, even on appeal in this court.

2. When the taking of testimony had been nearly concluded, the court, in the commendable desire to secure to the laborers the amounts due them for work performed upon the roadbed for Smith, made the following order:

" In this cause it appears that there are claims for labor, material, etc., aggregating about $5,000, against John A. Smith, same being for labor performed and material furnished in connection with the construction of the railway of the defendant company before the institution of the proceedings herein; and it appearing further that said Smith received on account of the work he performed as contractor fifty-two bonds, of the par value of $26,000, which are a part of the bonds secured by the mortgage being foreclosed herein, and that he has sold such bonds to Merrill B. Mills, and received $5,000 in cash and $7,000 in a note dated March 16, 1899, payable six months after date, which note is under the control of Frank E. Robson, one of complainant's solicitors; and it further appearing that, since the appointment of the receiver herein, it became necessary to procure a renewal of certain franchises under which the railway company operates and maintains its road, and it was made a condition in one or more of such ordinances that certain or all of such claims for labor and material should be said, or such ordinances be sub-

ject to forfeiture; and the court conceiving that, under the facts recited, such claims for labor and material owing by said Smith, which the ordinances referred to required the .payment of, may be chargeable against said Smith, and be deducted from the amount remaining unpaid on said $7,000 note; and it being necessary, before a final decree can be made in this cause covering the subjects referred to, that all parties in interest be brought into this cause:

"It is ordered that Monday, July 17, A. D. 1899, at 10 o'clock a. m., be fixed as the time, and the circuit court room in the city of Port Huron the place, for any and all persons who have claims, or are interested in the presentation of claims, for such labor and material, to appear, present, and prove their claims, under the provisions of such ordinances; and, further, in order that all parties interested in the final determination of matters in controversy in this cause may be formally before the court, it is ordered that Merrill B. Mills, John A. Smith, Elliott G. Stevenson, and the River St. Clair Construction Company, Limited, appear in this cause, and file any petition or answer deemed necessary or proper to frame a proper issue for the final disposition and settlement of all matters involved herein, within ten days from this day, and that any of such parties be permitted to offer any additional proofs relating to the matters in controversy at the hearing above fixed for July 17, 1899; and that until such hearing all matters involved in this litigation remain *in statu quo;* and that the further hearing of the above-entitled cause be continued until July 17, 1899, at 10 o'clock a. m.

"It is further ordered that notice of such hearing be published once in each week for the two weeks preceding such hearing in each of the following newspapers published in the counties of St. Clair and Macomb: The Port Huron Weekly Times, the Marine City Globe, the Algonac Courier, and the Era of New Baltimore; and that a copy of this order be served on the River St. Clair Construction Company, Limited, eight days before such hearing, and also upon the Detroit National Bank, Abram Smith, Angus Smith, Samuel L. Smith, Jefferson T. Wing, Frank E. Robson; and that leave be and is hereby granted them and each of them to intervene and assert any claim they may have in or to said $7,000 note, or the proceeds thereof; and that any party or parties above named who desire to intervene and assert any claim or present any matter for consideration of the court in

connection with any of the matters referred to, file their answers and serve copies on solicitors for complainant and defendant railway company.

"This order is made on the application of the Detroit & River St. Clair Railway Company, and is opposed by Frank E. Robson, one of complainant's solicitors, and Alfred Lucking, of counsel for Merrill B. Mills."

This order was made against the protest of complainant. The most of these claims were held at that time by Swift, Reilly, and Tucker, for the benefit of Stevenson. They were the personal obligations of Mr. Smith. Stevenson, under his contract of sale to Swift and Reilly, had agreed to take care of all debts, claims, and liens against the railway company. It is now urged that the proceeding taken to bring in these claims is unknown to chancery practice, and that complainant could not be compelled, against its will, to bring in as defendants strangers to the suit. Counsel cite and rely upon 1 Daniell, Ch. Prac. 287; *Renfro* v. *Goetter*, 78 Ala. 311; *Harper* v. *Manufacturing Co.*, 100 Ill. 225; *Shields* v. *Barrow*, 17 How. 137; *Coleman* v. *Martin*, 6 Blatchf. 119 (Fed. Cas. No. 2,985).

There is much force in this contention. Ordinarily, a complainant is entitled to his choice as to parties defendant. If he fails to bring in a necessary party, so that the rights of all may be litigated, he will suffer the penalty by having his bill dismissed. The responsibility usually rests upon him. To this general rule there may be two exceptions: (1) Where there are relations of trust, or a trust fund to be administered; (2) where a fund is before the court, in which a person not a party is entitled to share. *Ex parte Printup*, 87 Ala. 148 (6 South. 418); Story, Eq. Pl. § 208. In such cases the parties claiming an interest in the fund usually are allowed to intervene by petition. This note is neither a trust fund, nor one in which the creditors of the defendant company, or of the construction company, or of Smith have any interest. They have no more interest in it than they have in any other credit or property of Smith which might be gar-

nished in the hands of third parties. Smith owned the bonds, sold them, and took a note in part payment. In a foreclosure suit by Mills, or his trustee for Mills' benefit, a court of equity has no power to order Smith's or Mills' creditors to be made parties to the suit, and to impound the note for their benefit. There was no agreement be-tween Smith and the defendant company, or between him and Stevenson, that these labor claims should be paid out of the proceeds of the money received from Mills on the sale of the bonds.

3. The learned circuit judge was familiar with the services rendered by the complainant and its solicitors, and we see no occasion to disturb the allowance made for their services. We also think that complainant was entitled to interest upon the amount found due upon the bonds.

The decree will be modified in accordance with this opinion, with costs to the complainant

The other Justices concurred.